**Harold PARKS, Plaintiff,**

v.

**CITY OF BREWER, et al., Defendants.**

**No. CIV. 98–205–B.**

United States District Court,
D. Maine.

July 16, 1999.

90

Warren M. Silver, Warren Silver, P.A., Bangor, ME, for Plaintiff.

Thomas F. Monaghan, Monaghn, Leahy, Hochadel & Libby, Portland, ME, for Defendants.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Plaintiff Harold Parks ("Plaintiff"), former City Manager of the City of Brewer, brings this Section 1983 action against Defendants the City of Brewer ("the City") and Mayor Donna Thornton ("Thornton"), Edward Campbell ("Campbell"), and Janet Cobb ("Cobb"), all City Councilors during Plaintiff's tenure ("Defendants"). Plaintiff alleges that Defendants declined to renew his employment contract without due process of law (Counts IV & V) and in retaliation for exercising his First Amendment right to speak concerning a municipal ordinance (Counts I & II). Plaintiff also asserts a claim against the City pursuant to the Maine Whistleblowers' Protection Act, Me.Rev.Stat. Ann. tit. 26, §§ 831–40 (Count III). Before the Court is Defen-

1. The precise nature of the City Manager's duties apparently is governed by the Brewer City Charter, which is not part of the record in this case. The parties agree, however, that the City Manager is responsible for the enforcement of the City's laws and ordinances. The Court draws further inferences concerning the City Manager's responsibilities from the record, particularly from the evaluation

dants' Motion for Summary Judgment on all Counts of Plaintiff's Complaint. For the reasons stated below, Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

## I. SUMMARY JUDGMENT

Summary judgment is appropriate in the absence of a genuine issue as to any material fact and when the moving party is entitled to judgment as a matter of law, Fed.R.Civ.P. 56(c). An issue is genuine for these purposes if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one that has "the potential to affect the outcome of the suit under the applicable law." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir. 1993). Facts may be drawn from "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Fed.R.Civ.P. 56(c). For the purposes of summary judgment the Court views the record in the light most favorable to the nonmoving party. *See McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995).

## II. BACKGROUND

Plaintiff was employed as the City Manager of the City of Brewer from 1985 to February of 1997. As City Manager, his responsibilities included enforcement of the City's laws and ordinances and supervision of the day-to-day operation of City government.[1] He reported directly to the City Council.[2]

The terms of Plaintiff's employment were set forth in an Employment Agree-

forms used in connection with Plaintiff's performance reviews.

2. At all times relevant to this Motion, Thornton, Campbell, and Cobb were three of the City Council's five members. As Mayor, Thornton was the head of the City Council.

ment ("Agreement") dated May 6, 1986. Pursuant to the Agreement, Plaintiff's employment continued until February of 1989, after which it was governed by the Agreement's automatic renewal clause which extended his term "on a year to year basis ... on the same terms and conditions unless either party gives to the other at least 90 days written notice prior to the end of the initial term or any extension thereof of his or its intent not to renew this agreement." (Parks Aff. Ex. 2.). The City retained the right to terminate Plaintiff at any time for any reason prior to the expiration of the Agreement. (Parks Aff. Ex. 2.). The Agreement also provided for regular salary increases and bi-annual performance reviews conducted by the City Council, the results of which were to be furnished to Plaintiff in the form of a written summary. In addition, Plaintiff claims that when he accepted the City Manager position, it was understood that he would move to the City and settle there.

The Agreement was renewed each year from 1989 through 1996. Plaintiff received scheduled salary increases and was never subject to discipline. In fact, Plaintiff claims that throughout this period he received good to excellent performance reviews. Defendants dispute this assertion and contend that various Councilors had been critical of Plaintiff's performance, some as early as 1994. In support of this contention, Defendants point to written evaluation sheets completed by several Councilors, including Thornton, Cobb, and

Campbell.[3] Plaintiff counters that he was never provided with these particular evaluation sheets, and that in July of 1995 and January of 1996 he did not receive even the summary evaluations to which he was entitled under the Agreement. He further states that he has no recollection that the concerns reflected in these evaluation sheets were ever brought to his attention.

At his July 1995 evaluation, Plaintiff was informed by the City Council that it had decided to place the Economic Development Department and the Code Enforcement Office under the direction of one person, Les Stevens ("Stevens"), who at that time was serving as the Economic Development Director under Plaintiff's supervision. Plaintiff voiced his objection to this arrangement because, in his view, it created an apparent conflict of interest. Seven months later, in early February of 1996, an incident implicating that anticipated conflict of interest occurred: Stevens informed a local real estate developer, Carol Epstein ("Epstein"), that she would not be required to obtain a site review for her proposed commercial use of a 35,000 square foot lot, despite the existence of a City ordinance that required a site review for all non-residential uses of unvegetated land exceeding 5,000 square feet.[4] As Plaintiff's reaction to this incident gave rise to the alleged act of retaliation by the City Council, the Court will recount the facts in some detail.

The site at issue was a vacant lot located on Wilson Street in Brewer. When ap-

---

3. In performance evaluation sheets from July and December of 1994, Thornton identified various areas of concern, including a negative City image; a perception that the City could not handle crisis; a perception that the City had no plan for moving forward; lack of useful communication between Plaintiff and the Council; and lack of leadership and cohesion among City staff. The December 1994 evaluation sheets of Cobb and Councilor Donald LaGrange reflected some similar concerns.

Thornton's evaluation sheet from July of 1995 indicated continued dissatisfaction with Plaintiff's performance. Cobb's July 1995 evaluation is positive overall, but noted areas needing continued improvement.

4. The ordinance provides in relevant part:

Uses permitted, subject to the provisions of Site Plan review ... Non-residential uses in [general business districts] which exceed 5,000 square feet of gross floor area *or utilize 5,000 sq. ft. of unvegetated area in the development.*

(Parks Aff. ¶ 27.) The underlined portion of the ordinance, known as the "Hawkins Amendment," was passed by the City in November of 1994.

proached with a proposal to use the lot as a display area for the sale of mobile homes, Stevens told Epstein that no site review was necessary.[5] When Stevens reported his decision to Plaintiff, Plaintiff voiced his disagreement and stated his belief that the ordinance mandated a site review. Although disputed by Defendants, Plaintiff alleges that he instructed Stevens to inform Epstein that a site review was, in fact, required. In any event, it is undisputed that Stevens did not reverse his decision with regard to the site review requirement, nor did he tell Epstein to submit a site review request. Instead, Stevens contacted Thornton, Cobb, and Campbell to ask for their opinions of his decision as members of the City Council. The three Councilors expressed their agreement with Stevens's decision and discussed amending the ordinance to explicitly exempt uses such as the one proposed by Epstein. According to Stevens, he stopped contacting Councilors once he obtained the support of the number necessary to amend the ordinance.

Plaintiff learned of Stevens's discussions with the three Councilors concerning the site review issue on February 9, 1996. On February 12, Plaintiff informed Thornton that he believed it was wrong for her, Cobb, and Campbell to exempt the proposed use of the Wilson Street property from the site review requirement. Thornton responded that the Councilors agreed with Stevens's decision regarding the applicability of the site review requirement in this case and that the Council planned to revise the ordinance.

On February 20, 1996, eight days after Plaintiff spoke with Thornton about the site review, he was notified that his January 23, 1996 performance evaluation was being "continued" to March 18, 1996. Defendants allege that Plaintiff's January 23 performance review was not completed that night because the meeting had run late into the evening. Plaintiff counters that meetings had frequently run later, and that both he and Councilor Larry Doughty believed his evaluation had been concluded in January. Plaintiff further claims that neither he nor Councilors Doughty and Campbell believed that Plaintiff's job was in jeopardy after his January 23 evaluation.[6] Shortly before the March 18 City Council meeting, however, Thornton contacted three of the four other Councilors to discuss whether Plaintiff's contract should be renewed. At the meeting, Plaintiff was informed that the Council probably would not renew his contract when the issue came up for a vote in October of 1996.

On October 22, 1996, the City Council voted 4 to 1 against renewing Plaintiff's contract. The majority was comprised of Thornton, Cobb, Campbell, and a newly elected Councilor, Bruce Johnson. Cobb's notes from that meeting indicate that her decision not to rehire Plaintiff was based on her dissatisfaction with his leadership, particularly with regard to his recommendation of an 8% tax increase, his failure to relocate the public works garage, and his pursuit of police department accreditation against the wishes of the City Council. Plaintiff vigorously disputes Cobb's claim that she was motivated not to renew his contract based on these issues.[7] He also

5. In his deposition, Stevens states that he believed that the Hawkins Amendment was not intended to apply to such a use in light of the specific circumstances which prompted the Amendment's enactment.

6. Thornton signed what appears to be a composite evaluation sheet from Plaintiff's January 1996 performance review showing both areas of strength and areas requiring improvement. Campbell's evaluation sheet from the January 1996 review cites numerous

areas of concern, while Cobb's generally positive evaluation sheet identifies recurring controversy and a lack of innovative problem solving as ongoing concerns.

7. With regard to Cobb's assertion that Plaintiff submitted a budget that included a tax rate increase of 8% rather than the 2% directed by the Council, Plaintiff testified at his deposition that the Council never told him that a 2% increase was a requirement for the 1997 budget and that the overall budget he

states that he was not provided with written reasons for the decision not to renew his contract and was excluded from the executive session at which his employment was discussed by the Council.

## III. DISCUSSION

### A. Retaliation

Plaintiff alleges that Defendants retaliated against him by failing to renew his employment because of his statements to Thornton concerning Stevens's decision not to require a site review for the proposed use of the Wilson Street property. Plaintiff claims that by failing to renew his contract on account of these statements, the three Councilors violated his First Amendment rights (Count II) and the City violated his First Amendment rights (Count I) and the Maine Whistleblower's Protection Act ("MWPA"), Me.Rev.Stat. Ann. tit. 26, §§ 831–40 (Count III). Defendants move for summary judgment on the ground that Plaintiff's statements are not protected by either the First Amendment or the MWPA, and that, in any case, Plaintiff has failed to show that the statements figured in the decision not to renew his employment contract. The Court first will address Plaintiff's constitutional claim.

#### 1. First Amendment

##### a. Merits

 It is well-established that individuals do not forfeit their First Amendment right to free speech by virtue of their employment with the government. *See Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Rankin v. McPherson*, 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick v. Myers*, 461 U.S. 138, 142, 103

S.Ct. 1684, 75 L.Ed.2d 708 (1983). This right is not absolute, of course, and its proper measure requires consideration of the needs of government in its role as employer as well as the interests of the employee and the public in the expression at issue. *See Pickering*, 391 U.S. at 568, 88 S.Ct. 1731.

 To survive a motion for summary judgment, a public employee first must demonstrate that his speech pertains to a matter of public concern. *See Rankin*, 483 U.S. at 384, 107 S.Ct. 2891; *Connick*, 461 U.S. at 144–45, 103 S.Ct. 1684. Matters of public concern are those which can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Green v. Maine Sch. Admin. Dist. # 77*, 52 F.Supp.2d 98, 106 (D.Me. 1999) (quoting *Levinsky's, Inc. v. Wal–Mart Stores, Inc.*, 127 F.3d 122, 132 (1st Cir.1997)). Whether an employee's speech meets this standard is a question of law to be decided by the Court on the basis of "the content, form, and context" of the statements. *O'Connor v. Steeves*, 994 F.2d 905, 912 (1st Cir.1993) (quoting *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684).

 Once it is established that the speech at issue is of concern to the public, an employee must further demonstrate that the speech was a substantial or motivating factor in the adverse employment action taken against him. *See Green*, 52 F.Supp.2d at 105 (citing *Wytrwal v. Saco Sch. Bd.*, 70 F.3d 165, 170 (1st Cir.1995)). If the employee makes this showing, the government has an opportunity to demonstrate by a preponderance of the evidence that the adverse employment action would have been taken regardless of the employee's speech. *See O'Connor*, 994 F.2d at

submitted actually contained a proposed increase of only 4.1%. Moreover, Plaintiff claims that he submitted the proposed budget of which Cobb is critical in April of 1996, well after the Council informed him that his contract probably would not be renewed.

Contrary to Cobb's claim that Plaintiff failed to provide ideas for the relocation of

the public works garage, Plaintiff asserts that he pursued a viable site and proposed that the Council hire a consultant to study various public works issues.

Plaintiff further alleges that the Council ended up supporting the accreditation of the police department after some initial resistence.

913 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

▆ Finally, even if an employee succeeds in demonstrating that he would not have been subject to the adverse employment action absent his speech on a matter of public concern, his claim will fail if the government's interest in promoting the efficiency of the public services it performs through its employees outweighs the value of the employee's speech. *See Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). This is also a question of law for the Court. *See Rankin v. McPherson*, 483 U.S. 378, 386 n. 9, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

▆ In this case, Defendants do not seriously contest Plaintiff's assertion that his statements regarding the site review ordinance are a matter of sufficient public concern to meet the constitutional threshold. Indeed, the Court finds that the applicability of a land use ordinance is of obvious interest to the public. *See O'Connor*, 994 F.2d at 913–14 ("Where a public employee speaks out on a topic which is clearly a legitimate matter of inherent concern to the electorate, the court may eschew further inquiry into the employee's motives as revealed by the 'form and context' of the expression."). The fact that Plaintiff directed his statements to a supervisor, rather than to the public at large, does not render them beyond the sphere of public concern. *See Rankin*, 483 U.S. at 386–87 n. 11, 107 S.Ct. 2891 ("The private nature of the statement does not ... vitiate the status of the statement as addressing a matter of public concern.").

▆ Defendants do, however, challenge Plaintiff's claim that his statements were a substantial or motivating factor in the decision not to renew his contract. They argue that Plaintiff relies exclusively on temporal evidence and therefore has not established a genuine issue of fact as to the reason for the adverse employment action. While the Court recognizes that

suggestive timing alone cannot defeat a motion for summary judgment, *see Green v. Maine Sch. Admin. Dist. #77*, 52 F.Supp.2d 98, 106 (D.Me. 1999) (citing *Acosta–Orozco v. Rodriguez–de–Rivera*, 132 F.3d 97, 101 (1st Cir.1997)), it finds the temporal evidence in this case compelling. *See Perez v. Agostini*, 37 F.Supp.2d 103, 111 (D.P.R.1999) ("The close chronological order of a plaintiff's protected conduct and a defendant's alleged retaliatory conduct may warrant an inference of retaliation.") (citing *Ferranti v. Moran*, 618 F.2d 888, 892 (1st Cir.1980)).

Plaintiff held the position of City Manager for ten years. His employment contract was renewed every year from 1989 to 1996. In January of 1996, he departed his performance review believing, as did two other Councilors, that his job was secure. Upon hearing that Stevens had secured the approval of Thornton, Campbell, and Cobb for his decision to exempt the Wilson Street property from the site review requirement, Plaintiff voiced his opposition to Thornton. Eight days later, Plaintiff and Councilor Doughty were surprised to learn that Plaintiff's January review had been "continued" to March 18, 1996. On that date, Plaintiff was informed that his contract likely would not be renewed. While Defendants argue that there is no evidence that either Campbell or Cobb was aware of Plaintiff's statements at the March 18, 1996 meeting, the Court finds that a jury could infer their knowledge based on undisputed evidence that Thornton spoke to each of them about whether to renew Plaintiff's contract prior to the meeting.

In addition to this sequence of events, Plaintiff presents evidence that none of his evaluations before January of 1996 had ever been "continued," and that despite Defendants' assertion that the January 23 review could not be completed due to the lateness of the hour, many City Council meetings, including the one on March 18, ran later. Regarded in a light most favorable to Plaintiff, the Court is satisfied that

this evidence, together with the timing of events, could establish a prima facie case that Plaintiff's speech was a substantial or motivating factor in the decision not to renew his contract.

The Court further finds that there is a genuine issue of fact as to whether Plaintiff's contract would have been renewed regardless of his speech. Defendants contend that Plaintiff was not rehired because he "was not the right person for the job at the time" and cite problems voiced by Cobb just prior to the October 1996 vote, as well as negative comments in Plaintiff's performance evaluations dating back to 1994, (Defs.' Mot. Summ. J. at 11.) Plaintiff counters with evidence indicating that the matters about which Cobb complained could not have motivated the City Council's decision. As for the negative performance evaluations, while a jury might conclude from them that Defendants intended not to rehire Plaintiff even in the absence of his speech, a jury also could draw the opposite inference, that is, that Plaintiff's speech *was* a substantial or motivating factor in the adverse job action because, prior to Plaintiff's complaint, the City Council had not terminated his employment or declined to renew his contract despite longstanding dissatisfaction with his performance.[8]

This matter will not reach a jury, however, unless the Court determines that "the significance of the interests served by the public-employee speech—including the employee's interests in communicating, and the interests of the community in receiving, information 'on matters of public importance'" outweighs "the governmental employer's legitimate interests in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission." *O'Connor v. Steeves*, 994 F.2d 905, 915 (1st Cir.1993) (citing *Pickering v. Board of Educ.*, 391

U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). In making this determination, the Court must consider such factors as: (1) the public employee's motive for speaking; (2) the extent of the public interest in the content of the speech; (3) the nature of the employee's job; and (4) the nature and extent of the disruption to governmental operations. *See id.* at 915–916; *see also Rankin*, 483 U.S. at 388, 107 S.Ct. 2891 ("the manner, time, and place of the employee's expression are relevant [to the balance], as is the context in which the dispute arose"); *Brasslett v. Cota*, 761 F.2d 827, 839 (1st Cir.1985); *Perez v. Agostini*, 37 F.Supp.2d 103, 110 (D.P.R. 1999). When evaluating the disruption to governmental functions, relevant considerations include "whether the employee's comments disrupt harmony among co-workers; impede superiors from maintaining discipline; interfere with the agency's regular operations; or detract from the speaker's performance." *Perez*, 37 F.Supp.2d at 110; *see also McDonough v. Trustees of the Univ. Sys., of N.H.*, 704 F.2d 780, 784 (1st Cir.1983).

The parties' opposing positions on where the balance between their interests should be struck stem largely from their differing characterizations of the nature of Plaintiff's speech. Plaintiff claims that his speech should be afforded a high level of constitutional protection because he "objected to an inherent conflict of interest created by the City Council which ... resulted in ongoing problems with code enforcement." (Pl.'s Resp. Defs.' Mot. Summ. J. at 6.) According to Plaintiff, Defendants bear the burden of demonstrating that his whistleblowing speech resulted in a disruption to municipal operation and have failed to do so. He further argues that any disruption that may have occurred is attributable to the unethical nature of Defendants' actions, and not to his speech.

8. The Court does not hold that such an inference is reasonable in all cases. Here, however, the existence of negative performance reviews together with the circumstances surrounding the "continuation" of Plaintiff's January 23, 1996 performance review convince the Court that such an inference is possible.

In contrast, Defendants suggest that Plaintiff's statements were merely part of a policy dispute between high level municipal policymakers and, as such, are entitled to only minimal protection. In support of their argument, Defendants rely on the First Circuit's recent opinion in *Flynn v. City of Boston*, 140 F.3d 42, 47 (1st Cir. 1998). The plaintiffs in *Flynn* were the associate director for field operations and the associate director of administration and finance at Boston Community Centers, an agency of the City of Boston. *See id.* at 43. They alleged that the agency's newly appointed director fired them based on their political affiliation and in retaliation for their criticism of her decisions concerning policy and personnel matters. *See id.* at 44.

Relying on the Supreme Court's political patronage jurisprudence as articulated in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Court first held that the terminations were justified as "political firings" because the plaintiffs occupied policymaking positions. *Id.* at 45–46. The Court then went on to address the plaintiffs' retaliation claim. Assuming at the outset that the plaintiffs' criticism of their supervisor was a matter of public concern and resulted in their termination, the Court nevertheless concluded that their statements were not protected. It reasoned that since the plaintiffs occupied policymaking positions, their interest in speech related to "office operation" was outweighed on the *Pickering* scale by the potentially negative effect of their statements on those " 'close working relationships for which personal loyalty and confidence are necessary.' " *See id.* at 47 (citing *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)).

Defendants liken *Flynn* to the present case, positing without objection that as the highest non-elected official in the City, Plaintiff was clearly a policymaking employee. They argue that, as in *Flynn*, Plaintiff's disagreement with a majority of the City Council over the "interpretation" of the site review ordinance was a valid basis for his termination because the City Council "can and should expect that the City Manager will carry out the City's policies without the specter of internecine battles over the application of the City's ordinances." (Defs.' Mot. Summ. J. at 8.)

The Court rejects Defendants' analogy to *Flynn* based on the significant difference between the nature of the speech at issue in that case and Plaintiff's speech in the case at bar. In *Flynn*, the employees expressed dissatisfaction related to "the operation of the office (primarily to matters of hiring, firing and discipline)." *Flynn*, 140 F.3d at 47. Here, on the other hand, Plaintiff questioned the actions of elected officials and a municipal employee which reasonably appeared to be in contravention of a municipal ordinance. Contrary to Defendants' contention, this was more than a mere policy disagreement. Plaintiff, for example, was not simply expressing his opinion about the propriety of the Councilors' intention to amend the ordinance.[9] Rather, he objected to the exemption of a particular commercial use from the operation of a valid ordinance against the backdrop of a perceived conflict of interest in the municipal structure. As the First Circuit and other courts have acknowledged, such speech approaches "the highest rung of the hierarchy of First Amendment values." *O'Connor v. Steeves*, 994 F.2d 905, 915–16 (1st Cir.1993) (citing *Connick v. Myers*, 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)) (describing plaintiff's "disclosures concerned alleged abuse of public office on the part of an elected official"); *see also Roth v. Vet-*

9. The ordinance was not amended before Plaintiff complained, nor does the record indicate that it was ever amended.

*eran's Admin.,* 856 F.2d 1401, 1405 (9th Cir.1988) (finding employee's speech protected by First Amendment where he alleged that government employer "wasted resources, acted unethically, mismanaged personnel, and violated safety regulations"); *Brasslett v. Cota,* 761 F.2d 827, 846 (1st Cir.1985) (holding that statements by town fire chief regarding inadequacy of town's fire fighting capabilities were constitutionally protected); *Moynihan v. Hickey,* 627 F.Supp. 466, 472 (D.N.H.1986) (finding that plaintiff's complaints about perceived improper composition of membership of Council and improper selection of chairman of Council enjoyed constitutional protection); *Joslyn v. Kinch,* 613 F.Supp. 1168, 1172 (D.R.I.1985) (finding First Amendment protection where public employee released information of potential embarrassment to city officials including "the accounting method used by the City in determining tax revenues received after the end of the fiscal year but applied as revenue within the fiscal year to reduce or eliminate deficit spending"). Indeed, in *Pickering* itself, the Supreme Court recognized the electorate's interest in safeguarding the speech of community members, such as Plaintiff, who are most likely to have "informed and definite opinions" on matters of legitimate public concern. *Pickering,* 391 U.S. 563, 571–72, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

■ Given the vital nature of Plaintiff's speech, the Court finds that Defendants are not relieved of their burden to demonstrate that his statements disrupted governmental function simply because Plaintiff was a high level policymaker. *See Rankin,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) ("The State bears the burden of justifying the discharge on legitimate grounds."); *Connick,* 461 U.S. at 150–51, 103 S.Ct. 1684 (finding that government must make "additional, independent showing of actual and significant

harm"); *Brasslett v. Cota,* 761 F.2d 827, 845 (1st Cir.1985) (holding that plaintiff's statements regarding inadequacy of town's fire fighting capabilities protected where town manager's argument that plaintiff's speech had a detrimental effect on him was "contrived"). While in *Flynn* the First Circuit largely assumed that disagreements between an agency's director and her associate directors over office operation were per se disruptive, the Court recognized that it "would be a different case if an executive were fired for reporting a crime or fraud." *Flynn,* 140 F.3d at 47. In this respect, the circumstances of the present case are much closer to those of another First Circuit case, *O'Connor v. Steeves,* 994 F.2d 905 (1st Cir.1993), than the situation in *Flynn.*

In *O'Connor,* the superintendent of a town's public works department alleged that he was fired for disclosing a selectman's improper use of a public account.[10] As in *Flynn,* the *O'Connor* court ruled that the superintendent was subject to political discharge because he was a policylevel employee. In contrast to *Flynn,* however, the Court went on to overturn the district court's grant of summary judgment in favor of the government on the grounds that the public had a great interest in the subject matter of the superintendent's speech and that "although the Town ha[d] shown considerable disruption ... it ha[d] not yet met its burden of showing that the disruption was attributable to the exercise of [plaintiff's] First Amendment right." *Id.* at 916. The Court explained that "notwithstanding [plaintiff's] status as a 'policymaking or confidential employee,' whose position required close working relations with the Board of Selectmen, ... we cannot assume, absent some showing by defendants, that the erosion of their working relationship was due to [plaintiff's] protected speech." *Id.*

---

10. According to the Court, the selectman purchased goods for personal use on the city's account which he later repaid. The state auditor subsequently determined that this practice, while improper, was not illegal.

Defendants in the present case have put forth no evidence whatsoever that Plaintiff's speech actually had a negative impact on the efficient delivery of government services. *See Pickering*, 391 U.S. at 568, 88 S.Ct. 1731. In particular, Defendants have not shown that Plaintiff's statements detrimentally affected Plaintiff's co-workers, the City Council, or his own performance. *See McDonough v. Trustees of the Univ. Sys. of N.H.*, 704 F.2d 780, 784 (1st Cir.1983) (setting forth considerations relevant to judging impact on government operation). In fact, Defendants have argued that Plaintiff's comments played absolutely no role in their decision to renew his contract.

The Court therefore holds that Defendants' interest in efficiency does not outweigh the interest of Plaintiff and the public in his speech concerning the site review ordinance and that his statements on this matter consequently enjoy constitutional protection. A jury will resolve the factual question regarding whether Plaintiff's protected speech was a substantial or motivating factor in the decision not to renew his employment contract. First, however, the Court must address the Councilors' claim of qualified immunity and the City's contention that it cannot be held liable for the Councilor's actions.

### b. Qualified Immunity

■ To assess a claim of qualified immunity, a court must determine (i) whether the plaintiff has alleged the violation of a clearly established right, and (ii) whether a reasonable, similarly situated defendant would have understood that the challenged conduct violated that clearly established right. *See Swain v. Spinney*, 117 F.3d 1, 9 (1st Cir.1997); *Comfort v. Town of Pittsfield*, 924 F.Supp. 1219, 1227 (D.Me.1996). In this case, Thornton, Cobb, and Campbell claim that they are entitled to qualified immunity because Plaintiff's constitutional right to speak concerning the site review ordinance was not clearly established at the time they decided not to renew his contract.

"To determine whether a public official has violated clearly established law, a court must evaluate the objective reasonableness of the alleged conduct in light of legal precedent." *El Dia, Inc. v. Rossello*, 165 F.3d 106, 109 (1st Cir.1999). When the existence of a constitutional right rests solely on the outcome of a balancing test, many courts have determined that the right generally is not clearly established for purposes of qualified immunity. *See, e.g., Gregorich v. Lund*, 54 F.3d 410, 414–15 (7th Cir.1995); *Rogers v. Miller*, 57 F.3d 986, 992 (11th Cir.1995); *Grantham v. Trickey*, 21 F.3d 289, 293–95 (8th Cir. 1994). As one court has explained,

> the reason for this rule is that where a balancing test is required, reasonable public officials cannot be expected to know what the outcome of application of the test will be, and therefore cannot be expected to know that what is being done will be a violation of a 'clearly established' right.

*Lynch v. City of Boston*, 989 F.Supp. 275, 288 (D.Mass.1997), *aff'd in part and rev'd in part on other grounds*, 180 F.3d 1 (1st Cir.1999).

While the First Circuit has yet to squarely address the relationship between the application of a balancing test and qualified immunity, it noted with approval the district court's grant of qualified immunity to selectmen in *O'Connor* who allegedly fired the superintendent of public works for disclosing an improper use of public funds. *See O'Connor v. Steeves*, 994 F.2d 905, 917 n. 11 (1st Cir.1993). Its approval was not without limitation, however. Specifically, the Court stated that " 'because Pickering's constitutional rule turns upon a fact-intensive balancing test, it can rarely be considered "clearly established" for purposes of the Harlow qualified immunity standard,' *at least where substantial disruption has been shown to exist as a basis for the discharge.*" *Id.* (quoting *Bartlett v. Fisher*, 972 F.2d 911,

916–17 (8th Cir.1992)) (emphasis added). This limitation has strong logical appeal: in the absence of disruption, a reasonable public official should know that retaliation is unjustified because there is nothing on the *Pickering* scale to outweigh the employee's speech on a matter of public concern. *See Kincade v. City of Blue Springs,* 64 F.3d 389, 398–99 (8th Cir.1995) (finding employers not entitled to qualified immunity where their allegations of workplace disruption unsupported by evidence); *Vojvodich v. Lopez,* 48 F.3d 879, 887 (5th Cir.1995) (finding district court erred in granting qualified immunity because "it should have been readily apparent to a reasonable sheriff that he could not retaliate against a policymaking deputy for exercising his First Amendment rights unless the deputy's activities had in some way disrupted the sheriff's department"); *Williams v. Kentucky,* 24 F.3d 1526, 1537 (6th Cir.1994) (finding no qualified immunity where plaintiff spoke on "matters of great public concern" and statements "had only minimal effect on the efficiency of the office"); *but see Lynch,* 989 F.Supp. at 289–94, *aff'd in part and rev'd in part on other grounds,* 180 F.3d 1 (1st Cir.1999) (granting qualified immunity where government employer failed to establish disruption of operations).

██ As discussed above, Defendants in the present case have presented no evidence that Plaintiff's complaint to Thornton about the site review issue caused any disruption in working relationships, the delivery of city services, or productivity. In light of this apparent lack of disruption, the outcome of the *Pickering* balance was clear and the Councilors should have known that failing to renew Plaintiff's contract in retaliation for his speech violated his First Amendment rights.[11] The Court therefore finds that the Councilors are not entitled to summary judgment based on a claim of qualified immunity.

### c. Municipal Liability

Defendants do not dispute that "local governing bodies ... can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where ... the action that is alleged to be unconstitutional implements or executes a ... decision officially adopted and promulgated by that body's officers." *Monell v. Department of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Relying on *Scott–Harris v. City of Fall River,* 134 F.3d 427, 438 (1st Cir.1997), *rev'd on other grounds sub. nom. Bogan v. Scott Harris,* 520 U.S. 1263, 117 S.Ct. 2430, 138 L.Ed.2d 192 (1997), they do contend, however, that a municipality cannot be held liable for the decisions of its legislative body absent a showing that a majority of the legislators harbored impermissible motives. Thus, they assert that there is no basis for the City's liability in the present case because there is no evidence that any Councilor except Thornton was aware of Plaintiff's complaint about the site review ordinance.

The Court rejects Defendants' argument since it already has found that the record permits an inference that both Cobb and Campbell, as well as Thornton, knew about Plaintiff's criticism of their handling of the site review issue and voted against renewing his contract on this basis. The existence of this genuine issue of material fact as to whether a majority of the City Council was impermissibly motivated precludes

11. Some courts have found that government officials are not entitled to qualified immunity even where there is evidence of disruption, if that disruption results from the disclosure, as in this case, of what an employee believed to be government wrongdoing. *See, e.g., Lambert v. Richard,* 59 F.3d 134, 137 (9th Cir.1995) (finding defendants not entitled to qualified immunity because reasonable government official would have known that employee's speech alleging poor management of library addresses matter of public concern); *Schultea v. Wood,* 27 F.3d 1112, 1120 (5th Cir.1994), *aff'd in part, rev'd in part,* 47 F.3d 1427 (5th Cir.1995) ·(denying defendants' claim of qualified immunity because "[n]o reasonable official ... could have assumed that he could retaliate against an employee [for disclosing] instances of misconduct regarding a public official").

a finding in favor of the City at the summary judgment stage.[12]

## 2. Maine Whistleblowers' Protection Act

 In Count III of his Complaint, Plaintiff asserts that the City violated the MWPA when the City Council voted not to renew his employment contract in retaliation for his complaint regarding the failure to enforce the site review ordinance.[13] The MWPA prohibits discrimination against an employee if:

> [t]he employee acting in good faith ... reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States.

Me.Rev.Stat. Ann. tit. 26, § 833(1)(A) (West 1988). To establish a prima facie case under the statute, an employee must prove that: (1) he engaged in activity protected by the Act; (2) he was the subject of adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action. *See Kelii v. Portland Sch. Dept.*, 988 F.Supp. 14, 19 (D.Me.1997);

*Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 154 (Me.1991). If the employee makes such a showing, the burden-shifting framework used in Title VII cases applies to permit the employer to demonstrate a legitimate, non-discriminatory reason for the adverse job action. The employee nevertheless will prevail if he demonstrates that the proffered reason is pretextual. *See Wytrwal v. Mowles*, 886 F.Supp. 128, 148 (D.Me.), *aff'd sub nom. Wytrwal v. Saco Sch. Bd.*, 70 F.3d 165 (1st Cir.1995).

Defendants argue that Plaintiff has failed to establish a prima facie MWPA claim because his conduct is not protected by the statute and there is no causal link between his conduct and the decision not to renew his contract. Defendants further argue that Plaintiff's claim must fail because he has not shown that the adverse job action taken by the City Council was motivated by anything other than his poor performance. For the reasons discussed in connection with Plaintiff's First Amendment claim, the Court is satisfied that there is a genuine issue of fact as to why Plaintiff's contract was not renewed. Thus, the remaining issue is whether his complaint to Thornton regarding the site review matter is protected by the MWPA.

**12.** The Court also notes, as did Defendants, that *Scott–Harris* stopped short of establishing a "bright line rule" that a plaintiff must demonstrate impermissible motivation on the part of each member of a legislative majority. Rather, the First Circuit allowed that "in a sufficiently compelling case," municipal liability may accrue where a plaintiff shows "(a) bad motive on the part of at least a significant bloc of legislators and (b) circumstances suggesting the probable complicity of others." *Scott–Harris*, 134 F.3d at 438. According to the Court, "[t]he key is likelihood: Has the plaintiff proffered evidence, direct or circumstantial, which, when reasonable inferences are drawn in her favor, makes it appear more probable (i.e. more likely than not) that discrimination was the real reason underlying the enactment of the ordinance or the adoption of the policy[.]" *Id.*

*Scott–Harris* itself involved a claim by the former administrator of a municipality's Department of Health and Human Services that the municipality violated her First Amend-

ment rights when its legislators passed a facially neutral ordinance eliminating her position. In upholding dismissal of this claim, the Court declined to elaborate on the features which would make a case "compelling" because it found that the plaintiff had failed to show even a likelihood that the legislature's action was motivated by animus. Without more guidance regarding what constitutes a "compelling case," this Court would be reluctant, even in the absence of the existing factual dispute, to hold Plaintiff to a higher evidentiary burden on summary judgment.

**13.** The parties do not raise, and the Court thus does not reach, the issue of the relationship between the MWPA and the Maine Human Rights Act, Me.Rev.Stat. Ann. tit. 5, §§ 4551–4631, with respect to remedies. *See Maine Human Rights Comm'n v. Maine Dep't of Defense and Veterans' Services*, 627 A.2d 1005, 1007 n. 8 (Me.1993).

In support of their argument that Plaintiff's complaint does not constitute protected conduct, Defendants maintain, as they did with respect to his First Amendment claim, that Plaintiff's conversation with Thornton concerned a difference of opinion, not a violation of law. The Court dismisses this contention, however, as it finds quite unambiguous the ordinance's requirement that all non-residential uses in general business districts that utilize 5,000 square feet of unvegetated area undergo a site review. Accordingly, Les Stevens's decision to exempt the 35,-000 square foot lot on Wilson Street from a site review appears to the Court, and reasonably could have appeared to Plaintiff, to be a clear "violation of a law adopted under the laws of ... a political subdivision of [the] State." Me.Rev.Stat. Ann. tit. 26, § 833(1)(A) (West 1988).

Defendants' argument that section 833(2) of the MWPA defeats Plaintiff's claim is similarly unpersuasive. Section 833(2) provides:

Subsection 1 does not apply to an employee who has reported or caused to be reported a violation ... unless the employee has first brought the alleged violation ... to the attention of a person having supervisory authority with the employer and has allowed the employer a reasonable opportunity to correct that violation.

Me.Rev.Stat. Ann. tit. 26, § 833(2) (West 1988). Defendants assert that Plaintiff could not "blow the whistle" on the site review issue because as Les Stevens's supervisor, Plaintiff was the authority to whom a violation was to be reported. This argument ignores the undisputed fact that Stevens's action was endorsed by the City Council which ultimately had supervisory authority over both Stevens and Plaintiff. Likewise, evidence that Stevens was the first to bring his contemplated violation of the ordinance to the City Council's attention does not put Plaintiff's complaint outside the purview of the statute. Unlike Plaintiff's statements opposing the City Council's acquiescence in Stevens's decision to contravene the ordinance, Stevens's attempt to gain the Council's approval cannot fairly be characterized as whistleblowing.

Defendants' Motion for Summary Judgment as to Plaintiff's MWPA claim is denied.

## B. Due Process

Counts IV and V of Plaintiff's Complaint allege that Thornton, Cobb, Campbell, and the City violated his procedural due process rights by depriving him of his contract without certain procedures guaranteed by the Constitution. Specifically, Plaintiff claims that he should have been afforded notice and an opportunity to be heard prior to the decision not to renew his contract, and that the decision itself should have been made by an unbiased decisionmaker. The Court need not evaluate these alleged procedural deficiencies, however, since it finds that Plaintiff did not have a property interest in the renewal of his contract.

In order to state a cognizable procedural due process claim, a plaintiff must show a deprivation of a constitutionally protected property or liberty interest. *See Krennerich v. Town of Bristol,* 943 F.Supp. 1345, 1352 (D.Me.1996) (citing *Carey v. Piphus,* 435 U.S. 247, 259, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)). "Property interests are not created by the Constitution, but are 'created and their dimensions defined by existing rules or understanding that stem from an independent source such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Lovejoy v. Grant,* 434 A.2d 45, 50 (Me.1981) (citing *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)).

"In Maine, a property interest in continued employment may be established by contract, statute, or by proof of an objectively reasonable expectation of con-

tinued employment." *Krennerich*, 943 F.Supp. at 1352 (citing *Mercier v. Town of Fairfield,* 628 A.2d 1053, 1055 (Me.1993)). Plaintiff's claim is premised on the latter of these three theories: he contends that he had a property interest in his continued employment as City Manager because of his objectively reasonable belief, shared by Defendants, that his contract would be renewed. According to Plaintiff, the objective reasonableness of this expectation is evidenced by the renewal of his contract each year for seven years without discussion, as well as the positive reviews and regular raises he received throughout that period. Plaintiff also notes an understanding between him and the City Council that he would move to Brewer when he accepted the City Manager position.

Unfortunately for Plaintiff, these circumstances simply do not give rise to a reasonable expectation of continued employment in light of the provision in his written Employment Agreement indicating that the City's right to decline to renew his employment was restricted only by a 90 day notice requirement. This provision rendered Plaintiff an employee at will with respect to the renewal of his contract and it is well established that such employees have no property right in continued employment. *See Cook v. Lisbon Sch. Comm.,* 682 A.2d 672, 676 (Me.1996) ("If a person is hired for a government position which is clearly terminable at the will of her superiors, the employee does not have a property interest in the position.").

The fact that the renewal of Plaintiff's contract was completely at the discretion of the City Council distinguishes this case from *Mercier v. Town of Fairfield,* 628 A.2d 1053, 1055 (Me.1993), cited by Plaintiff. In *Mercier,* the Supreme Judicial Court held that the plaintiff had an objectively reasonable expectation of continued employment based, in part, on evidence that his public employer had required him to relocate. In reaching its conclusion, however, the Court placed equal, if not greater, emphasis on its finding that the

plaintiff's employment was governed by the Town Charter which permitted termination only for just cause. *See id.* at 1055 n. 3 & 1056. Plaintiff's Employment Agreement affords him no such protection.

The Court grants Defendants' Motion for Summary Judgment as to Counts IV and V based on Plaintiff's failure to raise a genuine issue of fact as to the existence of a constitutionally protected property interest in his continued employment.

## IV. CONCLUSION

For the reasons discussed above, Defendants' Motion for Summary Judgment is GRANTED as to Counts IV and V and DENIED as to Counts I, II, and III.

*SO ORDERED.*