**Stuart RAMOS–BIAGGI, Plaintiff,**

v.

**Fred H. MARTINEZ, et al., Defendants.**

**Nos. CIV.98–1571(HL), 98CV1571.**

United States District Court, D. Puerto Rico.

April 7, 2000.

Judith Berkan, Rio Piedras, PR, Federico Lora–Lopez, San Juan, PR, for Stuart Ramos–Biaggi, Dr., plaintiff.

Ruben T. Nigaglioni, McConnell Valdes, San Juan, PR, Joseph D. Steinfield, David S. Friedman, Hill and Barlow, Boston, MA, Rachel Brill, Hato Rey, PR, Berenice B. Bellotti, McConnell Valdes, San Juan, PR, Raquel M. Dulzaides, Jimenez, Graffam & Lausell, Roberto F. Nater–Lebron, San Juan, PR, defendants.

## OPINION AND ORDER

LAFFITTE, Chief Judge.

This litigation is the result of Plaintiff Stuart Ramos–Biaggi's ("Ramos") termination from his job as Chancellor of the University of Puerto Rico at Mayaguez ("Mayaguez campus"). Ramos alleges that Defendants Fred H. Martinez ("Martinez") and Dr. Norman Maldonado ("Dr.Maldonado") participated in effecting Ramos' termination because of Ramos' unwillingness to hire professors based on their party affiliation.

Ramos brings suit against Martinez, Dr. Maldonado, and the University of Puerto Rico under 42 U.S.C. § 1983 for violation of his First Amendment rights, his right to due process, and his right to equal protection. See U.S. CONST. amend. I & XIV. Ramos names the University of Puerto Rico as a defendant only for the purpose of implementing any equitable remedies that the Court may grant. Ramos also brings, by way of an amendment to his original complaint, a § 1983 claim of retaliation against Defendant Fred Soltero–Harrington ("Soltero"), Ramos' successor as Chancellor. Finally, Ramos presses Puerto Rico law claims for violation of his rights to equal protection and due process under the Puerto Rico Constitution, P.R. LAWS ANN. tit. 31, § 5141 (1991) ("Article 1802"), and P.R. LAWS ANN. tit. 29, § 146 (1995) ("Law 100"); in so doing, Ramos invokes this Court's supplemental jurisdiction. See 28 U.S.C.A. § 1367 (West 1993). Both sides have filed motions for summary judgment and responses. See Dkt. Nos. 11, 18, 29, 37, 39, 47, 63, 76, and 78. Further, on March 10, 2000, the Court heard nearly four hours of oral arguments from counsel for both sides regarding the issues facing disposition on summary judgment. For reasons that follow, the Court grants summary judgment for Defendants on all claims, including Plaintiff's retaliation claim. Plaintiff's Motion for Partial Summary Judgment, Dkt. No. 29, is denied.

### Standard for Summary Judgment

The Court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining if a material fact is "genuine," the Court does not weigh the facts but, instead, ascertains whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; Leary v. Dalton*, 58 F.3d 748, 751 (1st Cir.1995).

Once a party moves for summary judgment, it bears the initial burden. Specifically, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [evidence] ... which it believes demonstrate the absence of a genuine issue of material fact." *Crawford–El v. Britton*, 523 U.S. 574, 118 S.Ct. 1584, 1598 n. 22, 140 L.Ed.2d 759 (1998) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once this threshold is met, the burden shifts to the nonmoving party. The nonmovant may not rest on mere conclusory allegations or wholesale denials. Fed. R.Civ.P. 56(e); *Libertad v. Welch*, 53 F.3d 428, 435 (1st Cir.1995). Instead, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Further, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Of course, the Court draws inferences and evaluates facts "in the light most favorable to the nonmoving party." *Leary*, 58 F.3d at 751 (1995). Still, even in discrimination cases, summary judgment is appropriate where the nonmoving party rests entirely upon "conclusory allegations, improbable inferences, and unsupported speculation" on any essential element of the discrimination claim. *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

### Statement of Facts

For purposes of this disposition, the Court shall give only a skeletal outline of

the long factual scenario upon which this case is founded, presenting the facts in the light most favorable to Plaintiff and drawing all inferences in his favor.

The University of Puerto Rico is made up of eleven constituent campuses. Dkt. No. 89 at 32. Upon the Court's inquiry at oral argument, counsel for both parties estimated that these eleven campuses, one of which is the Mayaguez campus, serve approximately 72,000 students. The Mayaguez campus has its own Chancellor, and the Chancellor serves "at the will of the Board" of Trustees ("Board"). Dkt. No. 89 at 32; P.R. LAWS ANN. tit. 18, § 606(a) (1994); P.R. LAWS ANN. tit. 18, § 602(e)(7) (1997). Further, the Chancellor reports to the Board, normally through the President of the University, Dr. Norman Maldonado. See Dkt. No. 89 at 33. Dr. Maldonado is not a member of the Board and has no vote in Board decisions. The Board consists of thirteen members, including Defendant Martinez, the Chairman of the Board of Trustees at all times relevant to the instant case. Dkt. No. 89 at 32–33. Of the thirteen members of the Board, ten are appointed by the Governor of Puerto Rico with the advice and consent of the Senate of Puerto Rico; two are tenured faculty members elected to the Board by the faculty; and one is a student at the Mayaguez campus elected by the student body. See Dkt. No. 89 at 32.

Beginning in July of 1994, Ramos served as Chancellor of the Mayaguez campus. Dkt. No. 89 at 33. During Ramos' time in office, Defendants Martinez and Dr. Maldonado came under pressure from certain NPP loyalists to ensure that more NPP adherents found their way into various faculty and administrative positions at the Mayaguez campus. Martinez and Dr. Maldonado relayed these concerns to Ramos, who made clear that he was unwilling to consider political affiliation in making any appointments. Martinez and Dr. Maldonado never openly communicated to Ramos any desire to coerce him into towing the party line.[1]

Eventually, after a series of differences had arisen between Ramos and Dr. Maldonado, on June 17, 1997, Dr. Maldonado asked Ramos to resign and informed him that his failure to tender his resignation would result in his termination as Chancellor. The differences between Ramos and Dr. Maldonado pertained to communication problems between Ramos and Dr. Maldonado, Ramos' method of appointing new deans, alleged complaints about Ramos from members of the faculty and others, and Ramos' handling of the Mayaguez campus' attempt to gain membership in the NCAA. At the Board of Trustees' July 1, 1997 meeting, Board member Miguel A. Riestra moved to declare vacant the chancellorship of the Mayaguez campus. He claims that he did so based on Dr. Maldonado's having communicated to him that Dr. Maldonado had lost trust and confidence in Ramos as Chancellor. Dkt. No. 63, Exhibit 38. At the Board meeting, Riestra communicated to the other Trustees Dr. Maldonado's opinion that he had lost trust in Ramos and could no longer work with Ramos as Chancellor. At this meeting, Ramos was then terminated by a vote of the University of Puerto Rico's Board of Trustees. He remained at the Mayaguez campus in his pre-Chancellor capacity as a professor.

After his termination as Chancellor and the subsequent filing of the instant lawsuit,

---

1. Although there is no evidence that Martinez or Dr. Maldonado openly coerced Ramos, they did receive political pressure from an NPP Senator, Victor Marrero. The only character in this drama who could be said to have pressured Ramos was a consultant to Dr. Maldonado, former Senator Rafael "Rafo" Rodriguez ("Rodriguez"). On one occasion, Rodriguez invited Ramos to Dr. Maldonado's office ostensibly to meet with Martinez and Dr. Maldonado. Instead, Rodriguez met privately with Ramos and approached him about matters regarding the political affiliation of Ramos' appointees to the faculty. There is no evidence, though, that either Martinez or Dr. Maldonado knew about or ratified Rodriguez' activities. See Dkt. No. 76 at 15.

Ramos applied for funding from the University to attend a conference in Atlanta, Georgia. Then–Chancellor Soltero refused to grant Ramos' application on the grounds that Ramos was at the time embroiled in this lawsuit against the University and some of its officials. Subsequently, upon consulting with legal counsel, Soltero changed his mind and decided to grant Ramos the funding to attend the conference. As a result of the initial denial of funding, Ramos includes a claim for retaliation against Soltero.

## Discussion

### 1. First Amendment Claim

■■■ The crux of Ramos' case is his First Amendment claim for political discrimination arising from his termination as Chancellor of the Mayaguez campus. The First Amendment protects government employees in non-policymaking positions from discrimination based on their political affiliation. *LaRou v. Ridlon*, 98 F.3d 659, 661 (1st Cir.1996). Non-policymaking government employees who allege political discrimination have a threshold burden to produce evidence sufficient to allow a rational jury to find that their political affiliation was a substantial or motivating factor behind the adverse employment action taken against them. *Baez–Cruz v. Municipality of Comerio*, 140 F.3d 24, 28 (1st Cir.1998); *Rodriguez–Rios v. Cordero*, 138 F.3d 22, 24 (1st Cir.1998).

The legal foundations of Ramos' claim of political discrimination are complex. As a preliminary matter, Defendants concede that the position of Chancellor is *not* one for which political affiliation is an appropriate qualification. Thus, Ramos is for purposes of his political discrimination claim a non-policymaking employee.

Both parties make lengthy, well-reasoned arguments regarding the cognizability of Ramos' claim of political discrimination. Ramos is a member of the same party as Defendants, the NPP. Thus, discrimination based on his political affiliation is not strictly the basis for Ramos' claim.[2] Ramos contends, though, that § 1983 recognizes under the First Amendment a claim for failure to show sufficient loyalty even to one's own party. Defendants dispute this and further argue that even if Ramos' contention is correct, at the time of the relevant events in this case, it was not clearly established that such a claim existed. Thus, Defendants assert, they are protected by qualified immunity.

For purposes of this *brevis* disposition, though, the Court leaves these issues aside. Even if § 1983 were to recognize Ramos' claim, even if qualified immunity did not protect Defendants Martinez and Dr. Maldonado,[3] and even if Ramos were able to prove that Defendants intended to discriminate against him because of his unwillingness to follow the dictates of the NPP, Ramos has failed to present sufficient evidence to avoid summary judgment.

In the context of a constitutional tort under § 1983, as with any tort, a plaintiff must show not only that he was harmed but also that the defendant proximately caused his harm. *Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (holding that § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions"); *Scott–Harris v. City of Fall River*, 134 F.3d 427, 441 (1st Cir.1997) (setting forth the standard for causation as that of "proximate cause"), *rev'd on other grounds, Bogan v. Scott–Harris*, 523 U.S. 44, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998); *Wagenmann v. Adams*, 829 F.2d 196, 212

---

2. In his deposition, Ramos was asked, "Do you make any claim in this litigation of discrimination against you based on your own political party affiliation?" He answered, "No." Dkt. No. 63, Exhibit 8, Vol. I at 13.

3. The Court expresses no opinion as to whether qualified immunity actually protects Martinez and Dr. Maldonado in this case; Ramos' claim fails even if Martinez and Dr. Maldonado are not protected by qualified immunity.

(1st Cir.1987) (holding that evidence in § 1983 suit was sufficient for jury to find that the defendant "proximately caused" the harm at issue). Here, as with any tort, an intervening cause may break the causal chain linking the plaintiff's harm to the defendant's actions.

In their Memorandum in Support of the Motion for Summary Judgment, Dkt. No. 63, Defendants argue that even if Ramos can show that Martinez and Dr. Maldonado harbored an intention to discriminate against him, Ramos' claim must fail for lack of evidence of causation. The essential fact regarding causation in this case is that Ramos was terminated not by Martinez or Dr. Maldonado but by the University of Puerto Rico's 13–member Board of Trustees. Thus, a clear causal link exists between the action of the Board and Ramos' termination, but no such link exists between Ramos' termination and any action taken by Martinez or Dr. Maldonado. Other than Martinez, Ramos has not sued any members of the Board; further, there is no evidence to suggest that the Board acted with any improper motive. See Annex to this Opinion and Order.

The fact that the Board actually made the decision to terminate Ramos does not automatically foreclose Martinez or Dr. Maldonado's liability. The First Circuit has held that an action taken by a multi-person governing body does not necessarily cut the chain of causation to other defendants. See Scott–Harris, 134 F.3d 427 (dealing with the question, "How many municipal legislators (or, put another way, what percentage of the legislative body) must be spurred by a constitutionally impermissible motive before the municipality itself may be held liable under section 1983

for the adoption of a facially neutral policy or ordinance?"). Although Scott–Harris deals with the liability of a municipality, its logic applies to any situation in which a multi-person body intervenes in a causal chain.

This Court finds Judge Selya's reasoning in Scott–Harris to be particularly cogent and neatly applicable to the instant case, as follows:

> [W]e assume for argument's sake (but do not decide) that in a sufficiently compelling case the requirement that the plaintiff prove bad motive on the part of a majority of the members of the legislative body might be relaxed and a proxy accepted instead. Nevertheless, any such relaxation would be contingent on the plaintiff mustering evidence of both (a) bad motive on the part of at least a significant bloc of legislators, and (b) circumstances suggesting the probable complicity of others.

Scott–Harris, 134 F.3d at 438, rev'd on other grounds, 523 U.S. 44, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998).

■ Here, though, Ramos is unable to put forth evidence sufficient to create a genuine issue of material fact as to the illicit motivation of any of the members of the Board.[4] The only evidence of the state of mind of the other members of the Board suggests that they were motivated by legitimate, nondiscriminatory considerations.[5] This evidence regarding the Board member's legitimate, nondiscriminatory considerations is utterly uncontradicted by Ramos. Thus, the Court need not consider whether Ramos must put forth evidence regarding the motivation of a majority of the Trustees or merely a signifi-

---

4. Even as to Martinez' state of mind, Ramos' only evidence is that when Martinez was informed by Ramos of Dean John Fernandez Van Cleve's intention to resign, Martinez replied, "Your problems are solved." Dkt. No. 76, Exhibit 2, Vol. III at 68. This comment is not probative of Martinez' intention to bring about Ramos' termination on political grounds.

5. See deposition and statements under penalty of perjury of several members of the Board of Trustees, annexed hereto and made part of this Opinion and Order. Dkt. No. 63, Exhibits 7, 33, and 35–40.

*cant bloc plus complicity.*[6] With no causal link between Martinez or Dr. Maldonado and Ramos' termination, Ramos' claims against these two defendants can not stand. Accordingly, Ramos' First Amendment claims against Martinez and Dr. Maldonado are hereby dismissed with prejudice.

### 2. Due Process Claim

■■■ Ramos' due process claim also fails. A plaintiff bringing a procedural due process claim must demonstrate that state action has deprived him of a constitutionally protected interest in life, liberty, or property without due process of law. *Romero–Barcelo v. Hernandez–Agosto,* 75 F.3d 23, 32 (1st Cir.1996); *Pittsley v. Warish,* 927 F.2d 3, 6 (1st Cir.1991). For Ramos to have a due process claim, he must have a property interest in his position. The question of whether a person has a constitutionally protected property interest is answered by an independent, extra-constitutional source such as state law. *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 53 (1st Cir.1990). A government employee has a constitutionally protected property interest in continued employment if he reasonably expects that his employment will continue. *King v. Town of Hanover,* 116 F.3d 965, 969 (1st Cir.1997). In this case, although he makes some creative arguments to the contrary, Ramos was an at-will employee in his position as Chancellor of the University of Puerto Rico's Mayaguez campus. The Chancellor serves "at the will of the Board" of Trustees. P.R. LAWS ANN. tit. 18, § 602(e)(7) (1997). Accordingly, he had no reasonable expectation that his employment would continue. For this reason, the Court dismissed Ramos' due process claim with prejudice from the bench during oral argument. The foregoing discussion is simply the Court's reiteration of its reasons for that dismissal.

### 3. Equal Protection Claim

In Ramos' Opposition to Request for Summary Judgment, Dkt. No. 76 at 18, Ramos states that his Equal Protection claim "is formally being abandoned at this time." Accordingly, the Court dismisses this claim with prejudice.

### 4. Retaliation Claim

The facts surrounding Ramos' claim for retaliation are straightforward. According to Ramos, by the time that Soltero eventually extended an offer of funding for Ramos' conference-related expenses, Ramos was unable to make proper arrangements for attendance of the conference. Soltero disputes that his reconsideration of his initial denial of funding was insufficient to stave off a claim of First Amendment retaliation.

Both Ramos and Soltero agree that Soltero's eventual formal grant of funding took place three days before the conference was to take place. The only real dispute regarding Ramos' claim of retaliation is whether three days was sufficient time for Ramos to make arrangements to attend the conference.

■■■ State conduct which would not normally be a constitutional violation may support a cause of action under section 1983 if the conduct was done in retaliation for an individual's exercise of her constitutionally protected rights. *Ferranti v. Moran,* 618 F.2d 888, 892 n. 4 (1st Cir. 1980). Such state action would strike at the heart of the First Amendment. *Gibson v. United States,* 781 F.2d 1334, 1338 (9th Cir.1986). To succeed on such a claim, a plaintiff must show that he engaged in constitutionally protected conduct

---

**6.** Ramos does not allege the improper motivation of any Board members, nor does he allege any complicity between any Board members and Martinez or Dr. Maldonado. Even when pointedly asked at oral argument if there was any evidence suggesting Martinez' domination of the Board or any Board members' complicity with other improperly-motivated Board members or Martinez or Dr. Maldonado, counsel for Ramos could not answer in the affirmative.

and that retaliation against this protected conduct was a substantial or motivating factor for the underlying state action. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Blue v. Koren*, 72 F.3d 1075, 1082 (2nd Cir.1995). The defendant then has the burden of showing that he would have behaved identically even if the plaintiff had not engaged in the protected conduct. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576.

In this case, there is no dispute as to whether Soltero's initial denial of funding, standing alone, constituted retaliation against Ramos for the exercise of his First Amendment rights. Soltero as much as told Ramos that his intention was to retaliate against Ramos in his letter to Ramos denying Ramos funding.

Soltero contends that his eventual retraction of his initial denial of funding had the effect of negating any tangible effects on Ramos of Soltero's retaliatory action. Of course, for a plaintiff to succeed on a claim of retaliation, he must show that he *suffered* a retaliatory action. In other words, he must prove that an adverse action was taken against him. See *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712, 719, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996) (taking as given the requirement of an adverse action in political affiliation cases and applying it in its analysis of free speech cases). In this case, Ramos' inability to attend the conference constitutes the material adverse employment action. Again, neither side disputes that if Ramos' failure to attend the conference were the result of Soltero's denial of funding, Ramos would have a fully-constituted, mature claim for retaliation.

Thus, the issue is whether Ramos' failure to attend the conference was the result of Soltero's actions. Soltero's actions could only have caused Ramos' non-attendance if they effectively prevented Ramos from being able to make proper arrangements for his trip to the conference in Atlanta. It is on this issue that the parties disagree. Unfortunately for Ramos, he has failed to create a genuine issue of material fact as to whether Soltero actually prevented him from attending the conference.

Ramos presents evidence on this issue consisting of a recitation of the complex, time-consuming process required to obtain approval and funding from the University for such expenditures. Ramos avers that "[t]he process of obtaining the travel order and securing payment from the financial office typically takes at least a week to carry out." Plaintiff's Opposition to Motion for Summary Judgment, Dkt. No. 39, Exhibit A.

▮ Soltero, on the other hand, presents uncontradicted evidence that concedes the existence of this time-consuming process while describing an alternative, expedited process that was also available to Ramos. In statements by Inoel Rivera, Acting Dean of Administration, and Soltero, Soltero presents uncontradicted evidence that Ramos could have received a "manually-prepared" check as advance payment for his estimated trip-related expenses. This expedited process would have allowed Ramos to attend the conference. Further, Ramos, as former acting Chancellor of the Mayaguez campus, was fully aware of the existence of this process. See Reply to Plaintiff's Opposition to Motion for Summary Judgment, Dkt. No. 47, Exhibits 2 & 3. This uncontradicted evidence is sufficient to show that Ramos has failed to create a genuine issue of material fact on the issue of whether Soltero's actions prevented Ramos from attending the conference. Accordingly, the Court grants summary judgment in favor of Soltero on Ramos' claim of retaliation and dismisses Ramos' claim with prejudice.

### 5. Local Law Claims

Lastly, Ramos also brings a number of claims under Puerto Rico law. The assertion of supplemental jurisdiction over state law claims is within a federal court's dis-

cretion. *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). If federal law claims are dismissed before trial, however, the state law claims should also be dismissed. *Id.* at 726, 86 S.Ct. 1130; *Figueroa Ruiz v. Alegria,* 896 F.2d 645, 650 (1st Cir.1990); *Soto v. Carrasquillo,* 878 F.Supp. 324, 332 (D.P.R.1995), *aff'd sub nom. Soto v. Flores,* 103 F.3d 1056 (1st Cir.1997). Because the Court has dismissed Ramos' federal claims, the Court hereby dismisses without prejudice his Puerto Rico law claims.

**IT IS SO ORDERED.**

### ANNEX

**a) Aida Negron de Montilla:** "There should be no place in the University for politically partisan criteria either .... It should definitely not be ... the criterion to appoint ... or to nominate or select."

**b) Salvador E. Alemañy–Planell:** "As a Trustee, I never encountered political pressure concerning issues before the Board." He goes on to remark, "I voted in favor of the motion to declare the Chancellorship vacant because I understood that Dr. Ramos had become too autocratic at the Mayaguez Campus because of his problems with the faculty. Moreover, I understood that the University's President, Dr. Norman Maldonado, had lost confidence in Dr. Ramos. For these reasons, I believed that Dr. Ramos could no longer continue as Chancellor. At the Board's meeting on July 1, 1997, and in prior Board meetings, no one suggested that Dr. Ramos should be fired for political reasons. My decision to vote to declare the Chancellor's position vacant was not based on any political reasons or considerations. At the July 1, 1997 meeting, neither the President of the Board, Mr. Fred Martinez, nor anyone else put any pressure on me to vote in a certain way. At the time I voted my conscience on what I believed was the best decision for the University of Puerto Rico at the time that the decision was made."

**c) Angel Cintron Rivera:** "As a Trustee, I never encountered political pressure concerning issues before the Board." He continued, "I voted in favor of the motion to declare the Chancellorship vacant because I received information which caused me to doubt Mr. Ramos' effectiveness as the Chancellor of the Mayaguez Campus. The information concerned Dr. Ramos' overall work at the Mayaguez campus. At the Board's meeting of July 1, 1997, and in prior Board meetings, no one suggested that Dr. Ramos should be fired for political reasons. My decision to vote to declare the Chancellor's position vacant was not based on any political reasons or considerations. At the time of the Board's meeting, I was not even aware that Dr. Ramos had felt that he had encountered so-called 'political pressure.' At the July 1, 1997 meeting, neither the President of the Board, Mr. Fred Martinez, nor anyone else, put any pressure on me to vote in a certain way. At the time I voted my conscience on what I believed was the best decision for the University of Puerto Rico at the time that the decision was made."

**d) Antonio Perez Cuetara:** "I voted in favor of the motion to declare the position of Chancellor vacant because I regard the position as one of trust and confidence between the Chancellor, the President, and the Board. When I learned that the University's President, Dr. Norman Maldonado, had lost confidence in Dr. Ramos, I decided that Dr. Ramos could no longer serve effectively as Chancellor. At the Board's meeting on July 1, 1997, and in prior Board meetings, no one suggested that Dr. Ramos should be fired for political reasons. My decision to vote to declare the Chancellor's position vacant was not based on any political reasons or considerations. At the time of the Board's meeting, I was not even aware that Dr. Ramos had felt that he had encountered so-called 'political pressure.' At the July 1, 1997 meeting, neither the President of the Board, Mr. Fred Martinez, nor anyone else put any pressure on me to vote in a

certain way. At the time I voted my conscience on what I believed was the best decision for the University of Puerto Rico at the time that the decision was made."

**e) Miguel Garcia Morin:** "I voted in favor of the motion to declare the Chancellorship vacant because I understood that the University's President, Dr. Norman Maldonado, had lost confidence in Dr. Ramos. For that reason, I believed that Dr. Ramos could no longer continue as Chancellor. At the Board's meeting on July 1, 1997, and in prior Board meetings, no one suggested that Dr. Ramos should be fired for political reasons. My decision to vote to declare the Chancellor's position vacant was not based on any political reasons or considerations. At the time of the Board's meeting, I was not even aware that Dr. Ramos had felt that he had encountered so-called 'political pressure.' At the July 1, 1997 meeting, neither the President of the Board, Mr. Fred Martinez, nor anyone else, put any pressure on me to vote in a certain way. At the time I voted my conscience on what I believed was the best decision for the University of Puerto Rico at the time that the decision was made."

**f) Miguel A. Riestra:** "As a Trustee, I have never encountered political pressure concerning issues before the Board. On July 1, 1997, I attended a meeting of the Board of Trustees. At the meeting, I made a motion to declare the Chancellor's position at the Mayaguez Campus vacant based upon the recommendation [sic] Dr. Norman Maldonado, the President of the University. At that time, the Chancellor of the Mayaguez Campus was Dr. Stuart Ramos–Biaggi. I understood that Dr. Maldonado had lost confidence in Dr. Ramos, and for that reason, I believed that Dr. Ramos could no longer continue serving as Chancellor. After the Board discussed the motion, we voted. I voted in favor of the motion for the same reasons that I made the motion. At the Board's meeting on July 1, 1997, and in prior Board meetings, no one suggested that Dr.

Ramos should be fired for political reasons. My decision to vote to declare the Chancellor's position vacant was not based on any political reasons or considerations. At the time of the Board's meeting, I was not even aware that Dr. Ramos had felt that he had encountered so-called 'political pressure.' At the July 1, 1997 meeting, neither the President of the Board, Mr. Fred Martinez, nor anyone else put any pressure on me to make the motion or to vote in a certain way. At the time I voted my conscience on what I believed was the best decision for the University of Puerto Rico at the time that the decision was made. I pride myself of [sic] casting my vote at the Board meeting based solely on my own convictions, regarding what I consider best for the University of Puerto Rico."

**g) Francisco Somoza:** "I voted in favor of the motion to declare the Chancellorship vacant because I regard the position as one of trust and confidence between the Chancellor and the President. Once I learned that the University's President, Dr. Norman Maldonado, had lost confidence in Dr. Ramos, I decided that Dr. Ramos could no longer continue as Chancellor. At the Board's meeting on July 1, 1997, and in prior Board meetings, no one suggested that Dr. Ramos should be fired for political reasons. My decision to vote to declare the Chancellor's position vacant was not based on any political reasons or considerations. At the July 1, 1997 meeting, I voted my conscience on what I believed was the best decision for the University of Puerto Rico at the time that the decision was made."

**h) Jose Perez Delgado:** "I voted in favor of the motion to declare the Chancellorship vacant because I regard the position as one of trust and confidence between the Chancellor and the President. Once I learned that the University's President, Dr. Norman Maldonado, had requested the position to be declared vacant, I decided that Dr. Ramos should no longer continue as Chancellor. At the Board's meeting on

July 1, 1997, and in prior Board meetings, no one suggested to me that Dr. Ramos should be fired for political reasons. My decision to vote to declare the Chancellor's position vacant was based only on my view that the President of the University should have the ability to decide who should and who should not be part of his work team. At the July 1, 1997 meeting, I voted my conscience on what I believed was the best decision for the University of Puerto Rico at the time that the decision was made."